# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| DARYL WALLACE, | : | Case No. 3:17-cv-183 |
| Plaintiff, | : | Judge Thomas M. Rose |
| v. | : | |
| MONTGOMERY COUNTY, OHIO, et al., | : | |
| Defendants. | : | |

## ENTRY AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DOC. 28) OF DEFENDANTS MONTGOMERY COUNTY, OHIO AND THE MONTGOMERY COUNTY BOARD OF COMMISSIONERS AND MONTGOMERY COUNTY SHERIFF PHIL PLUMMER

This case is before the Court on the Motion for Summary Judgment (Doc. 28) filed by Defendants Montgomery County, Ohio and Montgomery County Board of Commissioners and Montgomery County Sheriff Phil Plummer ("Montgomery County Defendants"). The case arises out of an incident at the Montgomery County Jail on September 28, 2015 involving Plaintiff Daryl Wallace ("Plaintiff"), a detainee at the jail, and former corrections officer Jerrid Campbell. Plaintiff brought this action under 42 U.S.C. § 1983 against the Montgomery County Defendants and Campbell for an alleged violation of his civil rights.

On October 31, 2017, the Montgomery County Defendants and Plaintiff entered into a settlement agreement, which resolved the claims between them as well as all of Plaintiff's claims against Campbell. (Doc. 28 at 10.) Shortly thereafter, the Court granted Plaintiff's Motion to Dismiss his claims against all Defendants. (Docs. 23-24.) Due to pending cross-claims between the Montgomery County Defendants and Campbell, the dismissal of Plaintiff's claims did not

resolve the case.

On February 14, 2018, the Court granted Campbell's Motion for Judgment on the Pleadings, which dismissed the Montgomery County Defendants' Cross-Claim. (Doc. 33.) In the same Order, the Court also granted the Montgomery County Defendants' Motion to Dismiss Count III of Campbell's Cross-Claim. As a result, the only remaining claims in this case are Counts I, II, and IV through VIII of Campbell's Cross-Claim.

The Motion for Summary Judgment now before the Court is directed at Counts I and II of Campbell's Cross-Claim. In Count I, Campbell alleges that Montgomery County has a duty to provide representation for him under Ohio Rev. Code 2744.07. In Count II, he alleges that Montgomery County has a duty to indemnify him under the same statute. In his Opposition to the Motion for Summary Judgment, however, Campbell conceded that his indemnification claim is now moot. (Doc. 34.) The Montgomery County Defendants' Reply therefore focuses exclusively on the claim for representation. (Doc. 37.) Campbell later requested leave to file an affidavit in support of his Opposition, which the Court granted. (Docs. 40-41.) The Montgomery County Defendants filed a Response (Doc. 42) to the affidavit; no reply was permitted. On November 2, 2018, at Campbell's request, the Court held a hearing on the Motion for Summary Judgment and, specifically, Montgomery County's duty to defend under Ohio Rev. Code 2744.07. This matter is now fully briefed and ripe for review.

As discussed below, no genuine issue of material fact exists concerning Montgomery County's duty to defend under Ohio Rev. Code 2744.07, which provides that an employee is entitled to representation only "if the act or omission occurred while the employee was acting both in good faith and not manifestly outside the scope of employment or official responsibilities."

2

Ohio Rev. Code 2744.07(C). Under the facts in this case and in line with relevant Sixth Circuit precedent, no reasonable juror could find that Campbell acted in good faith during the incident at the Montgomery County Jail. The Court therefore **GRANTS** the Motion for Summary Judgment (Doc. 28) and **DISMISSES** Counts I and II of Campbell's Cross-Claim.

I. **BACKGROUND**

On September 28, 2015, Plaintiff Daryl Wallace was a detainee at the Montgomery County Jail, where Campbell worked as a Corrections Officer. That day Campbell supervised the "Delta Pod" of inmates, which included Plaintiff. The pod was on "lockdown" for certain periods due to an incident the previous day. Plaintiff asked Campbell why they were on lockdown and complained that his water had been cold for the last couple days. When Campbell replied that maintenance would not be able to come right away, Plaintiff became agitated.

Several hours later, Campbell observed Plaintiff being "very loud and disruptive" while out of his cell to get medication. Plaintiff approached Campbell's desk, which prompted Campbell to instruct him to "Get back!" Plaintiff replied, "I been to prison before and I'll act a fool in here, I don't give a shit." Plaintiff's statement made Campbell fearful. Campbell ordered Plaintiff to return to his cell. Plaintiff ultimately complied and slammed his cell door.

Later still, during a mealtime, Campbell observed Plaintiff yelling obscenities, some of which were directed at Campbell. Campbell ordered the inmates to turn in their food trays for a lockdown. Plaintiff approached Campbell's desk and demanded that maintenance fix the water in his cell. Campbell told him that maintenance was not coming to his cell and ordered him to "lockdown." Campbell told Plaintiff to lockdown six to seven more times, which he refused. Campbell called for additional officers to assist with an inmate refusing to lockdown. Campbell

then ordered the other inmates to lockdown, which they ignored. Campbell became scared at this moment and ordered Plaintiff to lockdown.

Plaintiff again refused to return to his cell. Campbell told Plaintiff to put his hands behind his back, which he also refused to do. At this point, a jail security camera captured the incident between Campbell and Plaintiff. The video shows Plaintiff entering into view in the rear right portion of the screen in front of the staircase leading up to the second floor of Delta Pod. Within seconds, Campbell enters the screen from behind the staircase, meeting Plaintiff at its base. Campbell removes his handcuffs from his belt as Plaintiff walks away from him, directly in front of a bay of windows. Plaintiff and Campbell briefly stop, face each other, and appear to exchange words—the video does not have audio. Without any visible movement from Plaintiff, Campbell quickly raises his arms and pushes Plaintiff's head, causing Plaintiff's upper torso to bend to his right (the left of the screen) before he stumbles and begins falling to the ground. Campbell moves quickly toward Plaintiff as he stumbles and pushes him all the way to the ground. While Plaintiff remains on the ground, Campbell throws a series of alternating punches with his right and left hands at Plaintiff's head and upper body. Reflections from the handcuffs in Campbell's right hand are visible while he throws punches; it is unclear, however, how they are positioned.

After two or three solid punches to the back of his head, Plaintiff pushes Campbell off of him and regains his footing. Campbell backpedals away, loses his balance, and knocks two chairs out of their place in a common area while falling to the ground. Campbell quickly gets back up, however, and walks back to confront Plaintiff, who is now standing. Plaintiff and Campbell stand face-to-face and possibly exchange words, then Campbell pushes Plaintiff again. Just as they faced each other, another corrections officer walked briskly toward them from the right side of the

4

screen. Before the other officer arrived, however, Campbell already pushed Plaintiff, causing him to fall into some chairs along the wall and under the bay of windows. Campbell lands additional punches on Plaintiff while the other officer assists in restraining Plaintiff on the ground.

Campbell attests that Plaintiff cursed at him repeatedly during the incident and threatened him bodily harm. Campbell claims that Plaintiff initially "took an aggressive stance and moved his upper torso forward" in a threatening manner, which prompted Campbell to shove him. The video, however, does not show Plaintiff making any movement toward Campbell to provoke the incident. Campbell also attests that he was in fear for his life—due to threats from Plaintiff and inmates watching the incident—and felt dazed and confused after falling into the chairs.

Plaintiff alleged that Campbell used the handcuffs as makeshift brass knuckles. The video does not contain the level of detail necessary to confirm this allegation. The video does show, during the first series of punches, Campbell landing two or three solid punches with his right hand to the back of Plaintiff's head. Later, the EMT who examined Plaintiff documented a cut to the back of Plaintiff's head, which is consistent with the handcuffs being wielded as a weapon.

Montgomery County Sheriff's Office Sergeant Scott Chapman, who was the officer assigned as the Second Watch Housing Sergeant at the time of the incident, reviewed the video on the day it occurred. Sergeant Chapman authored a memorandum, dated November 28, 2015, which opined that Campbell violated the Jail's Confrontational Policy and possibly its Use of Force Policy. This memorandum was ultimately delivered to Chief Deputy Rob Streck, who oversees the operations of the Montgomery County Sheriff's Office Inspectional Services Unit.

On September 29, 2015, Chief Deputy Streck assigned the incident to the Inspectional Services Unit for further investigation. Sergeant Dave Parin and Detective Bryan Cavender

conducted witness interviews, including an interview of Campbell, and reviewed the video footage and incident reports to determine if Campbell's conduct complied with Montgomery County Sheriff's Office and Montgomery County Jail Policy.

Following an initial administrative review, Detective Walt Steele of the Montgomery County Sheriff's Office also conducted an investigation—which included fifty-six interviews—and presented his findings to the Montgomery County Prosecutor's Office for review. The Prosecutor's Office did not accept the filing of any felony charges relating to Campbell's conduct. Detective Steele then presented the case to the Dayton Prosecutor's Office, which declined to accept any misdemeanor charges for Campbell's conduct.

Despite the fact that no criminal charges were accepted, the Montgomery County Sheriff's Office's internal investigation concluded that Campbell violated Montgomery County Jail's Confrontational Policy and Montgomery County Sheriff's Office Professional Conduct Rule 1 Violation of Rules. (Ex. A-1; Ex. A-3.)

The internal investigation also made the following factual findings:

[…] Officer Campbell did not notify his supervisor, Sergeant Judy Sealey, of the issues he was having with Mr. Wallace during his shift […]

[. . .] Officer Campbell's response to Mr. Wallace's refusal to obey commands was excessive. Mr. Wallace was not threatening or physically fighting with Officer Campbell.

Officer Campbell immediately closed in on Mr. Wallace as he (Wallace) fell into the chairs. Mr. Wallace attempted to get back up and Officer Campbell pushed Mr. Wallace again and then started punching Mr. Wallace in the head and upper body with closed fists. Again Officer Campbell's response to Mr. Wallace was excessive for Mr. Wallace's actions of trying to stand-up.

[…] Officer Walker assisted Officer Campbell take Mr. Wallace to the ground, Officer Campbell then delivered two more closed fist strike[s] to the right side of Mr. Wallace. Mr. Wallace did not appear to be resisting at that time. Officer

6

> Campbell's action of delivering two closed fist strikes as Mr. Wallace was taken to the ground was excessive.
>
> In Officer Campbell's report, he wrote Mr. Wallace moved his upper body toward him. Officer Campbell wrote he felt as if Mr. Wallace threatened him (Campbell) by his actions and that is why he pushed Mr. Wallace into the chairs. I reviewed the video and did not see Mr. Wallace move his upper body toward Officer Campbell. Mr. Wallace stood looking up at Officer Campbell with his arms at his side before Officer Campbell pushed Mr. Wallace into the chairs.
>
> The Montgomery County Sheriff's Office trains its employees to follow the Action-Response Continuum. In this case, Officer Campbell did not follow the continuum as trained. Officer Campbell's force was not in response to Mr. Wallace's actions.

(Ex. A-3.) Based on these findings, the internal investigation also concluded that Campbell violated Montgomery County Sheriff's Office Policy 1.1.3 Use of Force, Section A. (Ex. A-1; Ex. A-3 at 16-17.) Lastly, the internal investigation determined Campbell violated the Montgomery County Sheriff's Office Professional Conduct Rule 36, governing use of force. (Ex. A-1; Ex. A-3 at 17.)

Based on the findings of the internal investigation, Campbell received a written Order of Suspension, which included a ten working day unpaid suspension and remedial training. (Ex. A-2; Ex. A.) The Order of Suspension states that Campbell is suspended due to the incident involving Plaintiff and another, unrelated incident regarding use of force at the Montgomery County Jail. Campbell has since been terminated from his employment with the Montgomery County Sheriff's Office for continued violations of Montgomery County Sheriff's Office and Montgomery County Jail Policy. (Ex. A.)

## II. **LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A

*Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id*. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id*.

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

### III. ANALYSIS

As discussed, the parties agree that Count II of Campbell's Cross-Claim, for indemnification under Ohio Rev. Code 2744.07, is moot. That claim will be dismissed. Accordingly, the Court's analysis addresses only Count I for representation under Section 2744.07.

Section 2744.07(A)(1) of the Ohio Revised Code states:

> . . . a political subdivision shall provide for the defense of an employee, in any state or federal court, in any civil action or proceeding which contains an allegation for damages for injury, death, or loss to person or property caused by an act or omission of the employee in connection with a governmental or proprietary function. The political subdivision has the duty to defend the employee if the act or omission occurred while the employee was acting both in good faith and not manifestly outside the scope of employment or official responsibilities. Amounts expended by a political subdivision in the defense of its employees shall be from funds

9

appropriated for this purpose or from proceeds of insurance. The duty to provide for the defense of an employee specified in this division does not apply in a civil action or proceeding that is commenced by or on behalf of a political subdivision.

Ohio Rev. Code 2744.07(A)(1). Assuming the lawsuit meets the requirements set forth in the first sentence of the paragraph, an employee is entitled to representation if, at the time of the alleged act or omission, he was acting (1) in good faith, and (2) not manifestly outside the scope of employment or official responsibilities. *Id.* Under Section 2744.07(C), "[t]he pleadings shall not be determinative of whether the employee acted in good faith or was manifestly outside the scope of employment or official responsibilities." Ohio Rev. Code 2744.07(C). Both the good faith and scope of employment prong must be met; accordingly the failure to establish either prong is fatal to a demand for representation. The Montgomery County Defendants argue they are entitled to summary judgment because no reasonable juror could find that Campbell was acting either in good faith or not manifestly outside the scope of his employment when he engaged Plaintiff on September 28, 2015. Campbell disagrees as to both prongs.[1]

Bad faith is "[t]he opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, * * * not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Lowry v. Ohio State Highway Patrol*, No. 96API07-835, 1997 WL 84656, at *5 (Ohio Ct. App. Feb. 27, 1997) (quoting Black's Law Dictionary (5th Ed.1979), 127).

Here, even assuming that Campbell's conduct was not manifestly outside the scope of his duties, no genuine issue exists regarding the fact that he failed to act in good faith. As to this

---

[1] Campbell also argued that his claim should not be dismissed because he was entitled to a hearing under Ohio Rev. Code 2744.07(C). As mentioned, on November 2, 2018, the Court held a hearing on the Motion for Summary Judgment and Montgomery County's duty to defend. Campbell's argument that he is entitled to a hearing is therefore moot.

10

issue, the Court is guided by the Sixth Circuit's recent decision in *Anderson v. Sutton*, 717 F. App'x 548 (6th Cir. 2017), in which it overturned a district court's finding, after a bench trial, that an officer at a county jail acted in good faith during an altercation with an inmate.

In *Anderson*, the defendant, Connie Sutton, was a corrections officer in a county jail. The plaintiff, Holly Anderson, was an inmate at the jail under Sutton's supervision. Anderson brought claims against Officer Sutton for violation of her civil rights under 42 U.S.C. § 1983. Officer Sutton sought a legal defense from the county under Ohio Rev. Code 2744.07(A)(1).

The Sixth Circuit's recitation of the facts in *Anderson* shows the similarities between it and this case:

> On June 13, 2012, corrections officer Connie Sutton was responsible for overseeing the female section of the Portage County Jail. She was the only officer on duty at the time of the incident in question, and the unit was overcrowded: it had capacity for 34 inmates but housed 52, resulting in cramped conditions. Inmates reportedly were angry about the overcrowding.
>
> At around 8:00 pm, Anderson was in the prison's common area. She then walked through an open doorway to Sutton's desk, to ask permission to attend a church service. Sutton refused, saying church was a privilege and Anderson had been "nasty" all day. Anderson returned to the common area. A few minutes later, she went back to Sutton's desk to request prison grievance forms for herself and a friend. Sutton gave a form to Anderson, but said the friend would have to request one herself. What happened next was captured on two different video cameras.
>
> Anderson returned to the common area and said something to Sutton. She continued walking away, then turned and said something else. According to Sutton, Anderson called her a "n[***] bitch" and vowed to "take her down." Sutton called *550 Anderson a "bald-headed heifer." Anderson walked away, towards cell #43. A moment later, Sutton also walked in that direction, holding a grievance form to give to the inmate in that cell. Anderson turned to face Sutton, seeming to impede her progress. At that point, she may have poked Sutton in the chest. The two traded insults, inches apart, until Sutton pushed Anderson away. They then advanced towards each other until Sutton again pushed Anderson away.
>
> A fight ensued. Both Sutton and Anderson threw punches. After about 10 seconds, Sutton wrestled Anderson to the ground. While Anderson was on the ground,

11

> Sutton got on top of Anderson, put her hands around Anderson's neck, and repeatedly punched and slapped her in the face. She appeared to choke Anderson, who was squirming beneath her, largely helpless. Anderson eventually managed to crawl a few feet away, at which point she pushed Sutton backward with her feet. She then turned to look at her elbow, which was apparently injured. She made no attempt to get up or otherwise resume the confrontation. While Anderson was lying on the ground, not resisting, Sutton slowly and deliberately walked over and sprayed her in the face with "OC spray," i.e., pepper spray. Anderson shook her head back and forth in an attempt to avoid the spray and then sat on her knees, hunched over and exhausted. Again, she made no attempt to get up or otherwise resume the confrontation. Nonetheless, Sutton walked around her and again sprayed her in the face with pepper spray. At that point, the altercation ended. Anderson was hunched over panting, repeatedly saying "I can't breathe."
>
> Within 24 hours, the County put Sutton on administrative leave. Two days later, Sutton was fired. She was later convicted in Ohio state court of aggravated felonious assault on Anderson. The jury in that case rejected Sutton's defense that her use of force was justified.

*Anderson*, 717 F. App'x at 549–50.

The district court in *Anderson* denied the county's motion for summary judgment on Officer Sutton's duty-to-defend claim, which then proceeded to a bench trial. After the bench trial, the district court found that Officer Sutton was entitled to a defense. In its findings, the district court "blamed Anderson for the fight, finding that she had crossed the red line surrounding Sutton's desk, refused Sutton's orders, escalated the confrontation by poking Sutton's shoulder, and invaded Sutton's reactionary gap." *Anderson*, 717 F. App'x at 552. The Sixth Circuit observed that the district court also found, at least implicitly, that Officer Sutton used pepper spray to subdue Anderson, not to inflict gratuitous punishment. *Id.*

The Sixth Circuit held that the district court's findings were clearly erroneous and reversed on the issue of good faith. The Sixth Circuit held, "our review of the video convinces us that [Sutton] failed to act in good faith when she twice walked over to Anderson to administer pepper sprays that were clearly unnecessary." *Id.* The Sixth Circuit continued, "The video of the

incident […] shows that when Sutton first sprayed Anderson, Anderson was lying on her back, holding her elbow. She was not a threat. When Sutton sprayed Anderson the second time, Anderson was on her knees, hunched over, looking at the ground. Again, she was not a threat." *Id.* The Sixth Circuit concluded, in its analysis of this video evidence, that "we are convinced that Sutton was attempting to punish or retaliate against Anderson for Anderson's role in the fight. And because we find that Sutton was attempting to inflict gratuitous physical punishment, we conclude that she was not acting in good faith. Therefore, the County has no obligation to defend her." *Id*.

The similarities between *Anderson* and this case are (or should be) obvious. In both cases, a corrections officer at a county jail was involved in an altercation with an inmate. In both cases, the inmate and corrections officer exchanged hostile or abusive words, confronted each other, and that confrontation rose to physical violence. There are differences between the cases. In *Anderson*, Officer Sutton used pepper spray against the inmate after it was no longer necessary to control the situation. Here, Campbell did not use pepper spray. Instead, he used his fists, one of which was holding handcuffs. The difference in the weapons used is not material. The same question must be answered in both cases – namely, was the use of force so far beyond what was necessary to further a legitimate penological interest that a reasonable juror could not infer that the officer acted in good faith?

As in *Anderson*, a reasonable juror in this case could not find that Campbell acted in good faith. A review of the policies and procedures governing the use of force by Montgomery County's corrections officers is helpful in framing the issue in this case. Under Montgomery County Sheriff's Office Policy 1.1.3 Use of Force, Section A, Force to Effect Lawful Objectives,

personnel "may use force only to protect themselves and others, or to effect an arrest and detain an individual." (Doc. 28-1 at 5.) In addition, "[a]ll personnel should view force as continuous succession or a continuum, where the escalation of force is in direct proportion to an appropriate objective." *Id.* Under Montgomery County Sheriff's Office Professional Conduct Rule 36, "[e]mployees must never use more force in any situation than is reasonable under the circumstances." (Doc. 28-2 at 31.)

The Montgomery County Jail Manual contains similar guidelines, emphasizes defusing a potentially hostile situation, and directs officers to remove themselves from a confrontation whenever possible. It states, "When a staff member realizes that his communication with a prisoner is escalating into a confrontation, he attempts to defuse the situation by using his interpersonal communication and body language skills." (Doc. 28-2 at 24-25.) It continues, "If the staff member's attempt to defuse the situation fails, he immediately ends communication with the prisoner and if possible, removes himself from the area of confrontation." (*Id.*) On Use of Force, the Manual provides "Jail staff members must use force as a last resort in controlling inmates." (*Id.*) Lastly, it states that "[i]n no event is physical force justifiable as punishment." (*Id.*)

The jail security video establishes that Campbell's conduct fell far outside the policies and procedures governing his use of force as a corrections officer at the Montgomery County Jail. Campbell claims that Wallace initiated the physical confrontation, but the video evidence does not support that assertion. Instead, Campbell first pushed Wallace to the floor. Campbell threw many punches at Wallace while he was on the ground, but Wallace does not throw any punches at Campbell. Wallace's only physical movement toward Campbell is to push him away—which

14

occurred after Campbell landed punches to the back of Wallace's head. Campbell was the aggressor and used excessive force, even before taking into consideration that fact that he held handcuffs in his right hand.

If the incident ended with Wallace pushing Campbell away, the consideration of this issue would be more difficult. As shown in the video, however, it did not. Instead, Campbell briskly returns to Wallace and resumes the physical assault on him. It is evident that this second assault could not have served any penological purpose but must have originated out of a desire to punish Wallace for his insubordination or some other self-interested motive. At this point in the altercation, Wallace does not pose a threat to Campbell or anyone else. Campbell is far enough away that he is not within striking distance of Wallace—if, Wallace, had ever attempted to strike him. Shortly after Campbell resumes the confrontation, another officer arrives. Campbell knew this assistance was on its way because he requested it. (Doc. 41-1 at 4.) He did not need to approach Wallace again without backup.

Campbell's unnecessary resumption of the confrontation is similar to the unnecessary use of pepper spray in *Anderson*, after the inmate was clearly no longer a threat. The results of the internal investigation completed by the Montgomery County Sheriff's Office further supports the conclusion that Campbell cannot prove good faith.[2]

Campbell cites *Thomas v. Ohio Department of Rehabilitation & Corrections*, 48 Ohio App. 3d 86, 548 N.E.2d 991 (Ohio Ct. App. 1991). That case, however, is distinguishable. In *Thomas*, the Ohio court of appeals considered whether a law enforcement officer could be held liable under

---

[2] Campbell objects to the various reports and memoranda relating to the internal investigation as inadmissible hearsay. The Court does not consider the memoranda, however, as evidence of what occurred during the incident. Rather, they are evidence of the results of an internal investigation into the incident. Campbell does not object to the authenticity of the internal investigation memoranda as genuine business records.

Ohio Revised Code 9.86, not whether the officer was entitled to a legal defense under Ohio Rev. Code 2744.07. In addition, the case did not involve a fact pattern wherein an officer continued to engage in an altercation after an opportunity to de-escalate the situation.

Campbell has failed to create a genuine issue of fact as to whether he can establish good faith as required under Ohio Rev. Code 2744.07(A)(1). That failure alone is sufficient to warrant summary judgment in the Montgomery County Defendants' favor. The Court therefore does not consider whether Campbell could also show that his actions were not manifestly outside the scope of his employment.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Montgomery County Defendants' Motion for Summary Judgment (Doc. 28).

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, November 5, 2018.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE